IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JUL 1 6 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
JUL 1 9 2004

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 04C 4585 |
| | ) | |
| v. | ) | Judge DeR-Yeghiayan |
| | ) | |
| FIRST AMERICAN BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMERICAN BANK'S ANSWER TO PLAINTIFF'S COMPLAINT

First American Bank ("First American" or "the Bank"), by its undersigned counsel, answers the Complaint in the above-captioned matter as follows:

First American Bank denies the United States' allegations that the Bank has violated the Fair Housing Act (FHA), 42 U.S.C. §§3601-3619, and the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§1691-1691f, by discriminating on the basis of race, color, and national origin in the extension of residential real estate-related credit, consumer loans, and small business loans because the Bank has avoided marketing itself and doing business in majority minority census tracts in the Chicago and Kankakee, Illinois, metropolitan statistical areas ("MSAs"). First American has and continues to conduct its lending in a non-discriminatory manner and in compliance with the letter and spirit of fair lending laws.

First American has developed its lending presence in minority neighborhoods consistent with its growth as a lender based in the Chicago suburb of Carpentersville. In 2001, First American reconfigured and expanded its Community Reinvestment Act ("CRA") assessment

areas in light of its combination of three charters under which it was operating and the growth of its business in the general direction of Chicago. By doing so, First American increased the proportion of minority census tracts in its assessment area by almost 33%. Its lending in minority census tracts has increased as the Bank's geographic scope of business began to encompass a greater number of minority census tracts.

First American has taken a number of proactive steps as part of its ongoing effort to achieve growth in majority minority census tracts. First, the Bank opened one branch in a majority Hispanic census tract, and committed to open two more branches in majority minority neighborhoods. Second, the Bank expanded its advertising from general audience media, which already reached a substantial portion of the Chicago-Kankakee minority population, to include advertising in media specifically oriented toward minority audiences. Third, the Bank continued its deployment of off-site Automatic Teller Machines ("ATM") which provide an alternate delivery system for majority minority census tracts. Finally, the Bank undertook aggressive efforts to develop relationships with qualified brokers who do business in majority minority census tracts as another means of its enhancing its presence in majority minority neighborhoods.

The Bank's efforts have been successful, as evinced by its consistently increasing percentage of loans made in minority census tracts from 1999 through the first three quarters of 2003 based on analysis using 2000 census data. For example, the Bank made 9.2% of its Home Mortgage Disclosure Act ("HMDA") loans in majority minority census tracts in the year 2000. That percentage increased to 10.6% in 2001, 20.1% in 2002, and to 24.9% in the first three quarters of 2003. First American has also increased its consumer and CRA small business lending in majority minority census tracts in the past two years. Recognizing this performance in

making loans available to minority communities, the Federal Deposit Insurance Corporation ("FDIC") gave a "Satisfactory" rating to the Bank's recent CRA Performance Evaluation and reported that, "Overall, the bank's lending performance is deemed good."

In sum, First American has not engaged in discriminatory conduct on the basis of race in lending and has consistently increased its consumer lending in majority minority neighborhoods consistent with growth in its lending operations.

## I. SPECIFIC DENIALS

Unless specifically responded to, the Bank denies each and every averment in the Complaint. With respect to each of plaintiff's enumerated contentions, the Bank admits, denies, and states as follows:

1. This action is brought by the United States to enforce the provisions of Title VII of the Civil Rights Act of 1968, the Fair Housing Act, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§1691-1691f.

Answer: First American admits that Plaintiff brings this action to purport to enforce provisions of the Fair Housing Act (FHA), 42 U.S.C. §§3601-3619, and the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§1691-1691f.

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. §3614, and 15 U.S.C. §1691(h). Venue is appropriate pursuant to 28 U.S.C. §1391.

Answer: The allegations set forth in paragraph 2 state legal conclusions to which no answer is required.

3. Defendant First American Bank (hereinafter "First American" or "the Bank") is an Illinois state-chartered full service bank headquartered in Carpentersville, Illinois, and doing business primarily in the State of Illinois.

Answer: First American admits the allegations set forth in paragraph 3.

4.     First American offers the traditional services of a financial depository institution, including the receipt of monetary deposits; the financing of residential housing, commercial, and consumer loans; and other types of credit transactions. As of March 31, 2004, First American Bank had total assets of $1.9 billion and over $1.7 billion in deposits. First American was subject to the regulatory authority of the Federal Reserve Board (hereinafter "The Board") until November 24, 2003; since that time, the Federal Deposit Insurance Corporation has been its regulator.

Answer: First American admits the allegations set forth in paragraph 4.

5.     The Bank is subject to the federal laws governing fair lending including the Fair Housing Act, the Equal Credit Opportunity Act, and the Community Reinvestment Act ("CRA"), 12 U.S.C. §§2901-2906, and the regulations promulgated under each of those statutes. The Fair Housing Act and the Equal Credit Opportunity Act prohibit financial institutions from discriminating on the basis of, inter alia, race, color, or national origin in their lending practices.

Answer: The allegations set forth in paragraph 5 are legal conclusions to which no answer is required.

6.     Beginning in January 2001, the Federal Reserve Board conducted an examination of the lending practices of First American Bank to evaluate its compliance with the Fair Housing Act, the Equal Credit Opportunity Act, and the Community Reinvestment Act. Based on information gathered in its examination, the Board determined that it had reason to believe that First American was engaged in a pattern or practice of discrimination on the bases of race and national origin by redlining majority minority census tracts – defined as those with non-white populations of 50% or greater – in the Chicago and Kankakee, Illinois, metropolitan areas. The Board determined that the Bank was engaged in practices which prevented or discouraged the residents of those census tracts from obtaining equal access to residential, consumer, and small business credit because of the race, color, or national origin of the majority of the tracts' residents. The Board also lowered First American's CRA rating to "Substantial Noncompliance", the lowest possible. Of the 312 lending institutions the Board rated for CRA compliance between July 1, 2001, and June 30, 2002, First American was the only lender to receive that rating; the Board rated 40 lenders as "Outstanding", 270 "Satisfactory", and 1 "Needs to Improve".

Answer: First American admits the allegations set forth in the first four sentences in paragraph 6, although it disputed, and still disputes, the conclusions reached by the Federal Reserve Board. To the extent an answer may be required to the last sentence of paragraph 6, First American is without knowledge or information to form a belief as to those allegations and

therefore denies them.

7. Pursuant to 15 U.S.C. §1691e(g), the Board referred the matter to the Attorney General on May 14, 2002, for appropriate enforcement action, following the Board's determination as described in Paragraph 6.

Answer: First American admits the allegations set forth in paragraph 7.

8. First American Bank originated in the 1980s from the consolidation of eight smaller Chicago and Kankakee metropolitan area banks. By 1995, those banks had been further consolidated into three banks - First American Bank, Carpentersville; First American Bank, Kankakee; and First American Bank, Joliet. In September 1999, First American Bank Corporation consolidated the charters of those three institutions into one charter, First American Bank, Carpentersville, Illinois. By January 2003, First American had grown to a network of thirty-four branch offices located throughout the Chicago/Kankakee region. Throughout this time period, the banks were all operated under the same management.

Answer: First American admits the allegations set forth in paragraph 8.

9. The Chicago Metropolitan Statistical Area (hereinafter "Chicago MSA"), as defined by the United States Census, includes nine counties – Cook (including the City of Chicago), DeKalb, DuPage, Grundy, Kane, Kendall, Lake, McHenry, and Will.

Answer: First American denies that the United States Census, as of the date of this

answer, defines the Chicago MSA as including only the nine counties listed in paragraph 9. The

definition of the Chicago Primary Metropolitan Statistical Area ("PMSA") used in the year 2000

census, however, did include the nine counties listed in paragraph 9.

10. Residential housing data for the Chicago MSA show significant patterns of racial and ethnic segregation. According to 2000 Census data, the Chicago MSA is the third-most segregated metropolitan area in the nation for both African Americans and Hispanics of the metropolitan areas with populations of either group above 500,000. According to the 2000 Census, ninety percent (90%) of the Chicago MSA's African American residents and 76% of its Hispanic residents live in Cook County, while 68% of the MSA's African American residents and 53% of its Hispanic residents reside in the City of Chicago. 709 of the 800 majority minority census tracts in the Chicago MSA are majority African American, Hispanic, or combined African American/Hispanic. Eight census tracts are majority Asian and the other 83 minority tracts are a combination of various racial and ethnic minorities. See Map attached as Exhibit 1.

Answer: First American admits that year 2000 US census data most closely reflects

population characteristics as they existed during the period relevant to this action, 1999 to the present, and denies all the allegations set forth in paragraph 10 to the extent they are inconsistent therewith. With respect to the remaining allegations set forth in the first four sentences of paragraph 10, First American is without knowledge or information to form a belief as to those allegations and therefore denies them. To the extent an answer may be required to the last sentence of paragraph 10, First American is without knowledge or information to form a belief as to those allegations and therefore denies them.

11.     The Kankakee Metropolitan Statistical Area (hereinafter "Kankakee MSA"), as defined by the United States Census, encompasses Kankakee County. The Kankakee MSA, located approximately sixty miles south of Chicago, has 26 census tracts, of which four are majority African American and include over 60% of the MSA's African American population. See Map attached as Exhibit 1.

Answer:  First American admits the allegations contained in the first sentence of paragraph 11. First American denies the allegations set forth in the second sentence of paragraph 11 to the extent they are inconsistent with year 2000 US census data, and admits the remainder. To the extent an answer may be required to the last sentence of paragraph 11, First American is without knowledge or information to form a belief as to those allegations and therefore denies them.

12.     In operating and extending the scope of its business, First American has acted to meet the residential, consumer, and business credit needs of predominantly white residential census tracts (census tracts with a population greater than 50% non-Hispanic white) throughout the Chicago and Kankakee MSAs (hereinafter "the Chicago region"), and has avoided serving the lending and credit needs of majority minority tracts.

Answer:  First American denies the allegations set forth in paragraph 12.

13.     By the September 1999 consolidation, First American had expanded its business, including that of extending credit for residential real estate-related transactions, home equity, small business, and motor vehicle and other consumer loans, to substantial portions of the

Chicago region. In addition to enlarging the geographic scope of the area within which it extends such credit, a major component of the Bank's expansion included the construction or acquisition of additional branch offices, which are designed both to better serve existing customers and to attract new customers to First American's services and products.

Answer: First American admits the allegations set forth in paragraph 13.

14. First American has engaged in a race- and national origin-based pattern of locating or acquiring branch offices. It has located or acquired branch offices to serve the residential, consumer, and small business lending and credit needs of majority white census tracts but not those of majority minority tracts. In January, 2001, when the Federal Reserve Board commenced its compliance examination, First American had 30 branch offices in the Chicago region. None of those 30 branches are located in a majority minority census tract. According to the 2000 Census, the 30 branches are located in majority white census tracts in which minority populations range from 0.6% to 26.7%. See Map attached as Exhibit 2.

Answer: First American denies the allegations set forth in the first two sentences of

paragraph 14. First American admits the allegations set forth in the third and fourth sentences of

paragraph 14. With respect to the allegations set forth in the fifth sentence of paragraph 14, First

American denies them to the extent they are inconsistent with year 2000 US census data, which

shows that nine of those thirty branches were located in census tracts with populations higher

than alleged, and shows that the branches located at Adams, Elston, Melrose Park and Addison

were located in census tracts that had minority populations of 46.8%, 45.4%, 43.6% and 42.2%

respectively. Moreover, the average minority population in the census tracts of the Bank's

current thirty-five branches is 21.5% and continues to rise. To the extent an answer may be

required to the last sentence of paragraph 14, First American is without knowledge or

information to form a belief as to those allegations and therefore denies them.

15. Over the next two years, the Bank continued its race- and national origin-based pattern of adding or acquiring new branch offices to serve only white communities. By January 2003, First American had 34 branches, with three new ones in Cook County and one in Lake County. All four of these new bank branches are located in majority white areas. See Map attached as Exhibit 3.

7

Answer: First American denies the allegations set forth in the first sentence in paragraph

15. First American admits the allegations set forth in the second sentence in paragraph 15. First

American denies that all new branches established between January 2001 and January 2003 were

located in majority white areas. The Rolling Meadows branch, which was opened in August of

2001 and which was under construction at the time of the Federal Reserve Board examination, is

located in a census tract with a minority population of 58.5%. To the extent an answer may be

required to the last sentence of paragraph 15, First American is without knowledge or

information to form a belief as to those allegations and therefore denies them.

16. Race and national origin considerations also underlie the distribution of First
American's Automated Teller Machines ("ATMs"). As of January 2001, the Bank had 78 full-
service ATMs (deposit taking and cash-dispensing) in the Chicago region. None of the Banks's
full-service ATMs was located in a majority minority census tract. However, the Bank had
chosen to locate 18 (approximately 10%) of its cash-dispensing-only ATMs (also called
"CDMs") in minority census tracts. See Maps of ATMs and CDMs attached as Exhibits 4 and 5,
respectively.

Answer: First American denies the allegations set forth in the first sentence of paragraph

16. First American admits the allegations set forth in the second sentence of paragraph 16. With

respect to the third and fourth sentences of paragraph 16, First American denies all the

allegations set forth in paragraph 16 to the extent they are inconsistent with year 2000 US census

data. To the extent an answer may be required to the last sentence of paragraph 16, First

American is without knowledge or information to form a belief as to those allegations and

therefore denies them.

17. First American has actively solicited credit transactions through a variety of
discriminatory means, including, but not limited to, the use of mortgage brokers primarily
serving white communities in the Chicago region. As of January 2001, the Bank had a mortgage
broker network of 122 offices, all but one in the Chicago MSA. Of that total, 97.5% (119) were

located in majority white census tracts and only 2.5% (3) were located in minority tracts, each of which have small populations. See Map attached as Exhibit 6.

Answer: First American only admits that it has actively solicited credit transactions but denies the remaining allegations set forth in the first sentence in paragraph 17. First American admits the allegations set forth in the second sentence of paragraph 17. With respect to the third sentence of paragraph 17, First American denies all the allegations set forth in paragraph 17 to the extent they are inconsistent with year 2000 US census data. To the extent an answer may be required to the last sentence of paragraph 17, First American is without knowledge or information to form a belief as to those allegations and therefore denies them.

18.     The unlawful consideration of race and national origin in the business practices and customer solicitation efforts of First American is also evident from its advertising and marketing practices, including, but not limited to, its radio and newspaper advertising focus. The Bank has directed its radio advertising to stations that target "general audiences", although many minority format stations exist in the Chicago MSA market. In advertising its products and services through the media, First American never utilized radio stations oriented to minority communities in the Chicago MSA until after the Board's criticism of those advertising practices.

Answer: First American denies the allegations set forth in the first sentence in paragraph 18. With respect to the second and third sentences in paragraph 18, First American admits that it has directed radio advertising to "general audience" stations, denies directing all its radio advertising to such formats for the purpose of not marketing to minorities, and is without knowledge or information sufficient to form a belief as to whether "many minority format stations exist in the Chicago MSA market." In fact, the minority audience of so-called "general audience" stations exceeds that of the largest station with programming directed to African-Americans.

19.     The Bank has also consistently directed its print media advertising to daily newspapers of general circulation and neighborhood and suburban weekly newspapers serving

largely non-minority city neighborhoods and suburbs in the Chicago MSA. Until at least December 2002, the Bank had never advertised in minority-focused publications, many of which have larger circulations than some suburban newspapers the Bank has used.

Answer: First American admits the allegations set forth in the first sentence of paragraph 19. With respect to the second sentence of paragraph 19, First American is without knowledge or information sufficient to form a belief as to whether "many" minority-focused publications have larger circulations than "some suburban newspapers the Bank used," and admits the remainder. In fact, the general circulation newspapers reach more minorities at a lesser cost than many minority-focused publications.

20. The unlawful consideration of race and national origin in the business and customer solicitation efforts of the Bank is also evident from the community service, or assessment area, boundaries that First American has established under the Community Reinvestment Act. In establishing and modifying its assessment area over time, First American long excluded nearly all predominantly minority neighborhoods in the Chicago MSA. Pursuant to statutory direction, the Federal Reserve Board promulgated regulations to implement the CRA, 12 C.F.R. §228 ("Reg BB"). Under Reg BB, as amended in 1997, a large bank's assessment area must generally consist of one or more metropolitan areas or contiguous political subdivisions, §228.41(b), unless that area would be extremely large, of unusual con-figuration, or divided by significant geographic barriers, §228.41(d). Reg BB further provides that, if a large bank's assessment area does not include entire political jurisdictions, its assessment area may not reflect illegal discrimination. §228.41(e). First American's assessment area historically has not included entire political subdivisions, such as the City of Chicago or all of Cook and Kankakee Counties. The inclusion of these entire jurisdictions would not create an assessment area which would be extremely large, of unusual configuration, or divided by significant geographic barriers, the only exceptions specifically permitted by Reg BB.

Answer: First American denies the allegation in the first two sentences of paragraph 20. The third, fourth and fifth sentences of paragraph 20 state legal conclusions to which no answer is required. First American admits the allegations set forth in the sixth sentence of paragraph of paragraph 20. First American denies the allegations set forth in the seventh sentence of paragraph 20.

21.     Instead of defining its assessment area in accordance with Reg BB, First American has circumscribed its lending area in the Chicago region to exclude most majority minority neighbor-hoods.  For example, in 1998, the Bank delineated six highly irregularly-shaped assessment areas, and, in late 1999, it reconfigured them to consist of two distinct areas of the Chicago and Kankakee MSAs.  The Bank's Chicago MSA assessment area delineation excluded most minority communities in the Chicago MSA, despite a large number of them being adjacent to the non-minority tracts included in the assessment area.  The Bank's 1999 Chicago MSA assessment area included portions of six counties – Cook, DuPage, Kane, McHenry, Lake, and DeKalb – and its Kankakee assessment area included only a portion of that county.  The 1999 Chicago MSA assessment area included 792 census tracts, of which only 51, 6.4%, had a population that was majority minority.  In the Chicago MSA, over 34% of the census tracts were majority minority according to the 1990 census and over 42% were majority minority according to the 2000 census.  The Bank has not provided any nondiscriminatory rationale for its irregular, atypical assessment areas, not even the most rudimentary objective methodology allegedly used to define them.  See Map attached as Exhibit 7.

Answer:  First American has always defined its assessment area in accordance with the letter and spirit of all statutes and regulations, and therefore denies any allegations in paragraph 21 to the contrary.  With respect to the allegations set forth in the second sentence of paragraph 21, First American denies that the shape of its assessment areas in 1998 or 1999 was improper, as reflected by the Federal Reserve Board of Chicago CRA Performance Evaluation Public Disclosures of 1999, which did not conclude the assessment areas were "highly irregular," and even concluded that the Bank's CRA performance was generally strong.  Further, First American is without knowledge or information sufficient to form a belief as to the "regularity" of the assessment areas of similarly-situated banks.  First American denies the allegations set forth in the third sentence of paragraph 21.  First American admits the fourth sentence of paragraph 21.  With respect to the allegations set forth in the fifth and sixth sentences of paragraph 21, First American denies them to the extent they are inconsistent with year 2000 US census data.  First American has provided the non-discriminatory reason for its assessment area, that its combination of three separate banks and growth into the Chicagoland area from its base in the far

northwestern suburbs, and therefore denies the allegations set forth in the seventh sentence of

paragraph 21. To the extent an answer may be required to the last sentence of paragraph 21, First

American is without knowledge or information to form a belief as to those allegations and

therefore denies them.

22. Only in March 2001, after the Federal Reserve Board's compliance examiners expressed concern to Bank management about the assessment areas' exclusion of virtually all minority census tracts, did First American change its assessment area delineation to include all of the Chicago and Kankakee MSAs.

Answer: First American denies minority census tracts were excluded from its assessment

area, but First American admits the remainder of the allegations set forth in paragraph 22.

23. First American Bank officials have also made statements to examiners from the Federal Reserve Bank of Chicago with respect to the Bank's lending practices which are based on racial and ethnic stereotypes. Among those statements were ones which: (a) indicated that the Bank did not provide the full range of its services and lending products to minority borrowers because they were allegedly not interested in the full range of services the Bank offered to white customers; (b) indicated that the Bank did not provide the full range of its services and lending products to minority borrowers because they were allegedly qualified only for government-subsidized lending programs; and, (c) equated making loans in low income or minority neighborhoods with making bad loans.

Answer: First American denies the allegations set forth in paragraph 23.

24. Analyses of First American's residential real estate-related loan applications for 1999-2001 show that First American has served the credit needs of predominantly white census tracts of the Chicago region to a significantly greater extent than it has served the credit needs of predominantly minority neighbor-hoods.

Answer: First American denies serving the needs of white census tracts differently than

non-white census tracts, and further denies the allegations set forth in paragraph 24 to the extent

they are inconsistent with year 2000 US census data.

25. From 1999-2001, First American generated 10,365 residential real estate-related loan applications in the Chicago region, but only 705, or 6.8%, were secured by residential property located in majority minority census tracts. See Map attached as Exhibit 8.

Answer: First American denies all the allegations set forth in paragraph 25 to the extent

they are inconsistent with year 2000 US census data. Because the complaint fails to define which

of the various HMDA and non-HMDA real estate-related loans offered by the Bank it includes in

the so-called "real estate-related" loan application data, First American is without knowledge or

information to form a belief as to the number and percentages of such loan applications. To the

extent an answer may be required to the last sentence of paragraph 25, First American is without

knowledge or information to form a belief as to those allegations and therefore denies them.

26. In contrast, the percentage of such applications in the Chicago region which were secured by residential property located in majority minority census tracts for the aggregate of all Chicago and Kankakee MSA lending institutions was 20.8%, more than three times higher than First American's.

Answer: First American denies all the allegations set forth in paragraph 26 to the extent

they are inconsistent with year 2000 US census data.

27. In connection with the Board's 2001 fair lending examination, First American identified a group of twelve "peer" institutions to which it recommended its lending performance be compared. Of the total residential real estate-related loan applications submitted to this "peer group" in each year from 1999-2001, First American's percentage from majority minority census tracts ranged from 6.2% to 7.3% annually. In contrast, the percentage of such applications for the aggregate of this self-selected "peer group" ranged from 16% to 26% each year.

Answer: First American admits the allegations set forth in the first sentence in paragraph

27. With respect to the remaining allegations set forth in paragraph 27, First American denies

the allegations to the extent they are inconsistent with year 2000 US census data. Further, First

American is without knowledge or information sufficient to form a belief as to the performance

of the peer institutions based on 2000 census data and therefore denies them.

28. The geographic distribution of the dollar amounts of residential real estate-related loans funded by First American also demonstrates the consistently stark racial and national origin

division in its residential lending activities. Between 1999 and 2001, First American funded nearly $287,892,000 in single-family residential real-estate related loans in the Chicago region. Only 4.5%, about $13,087,000, went to majority minority census tracts.

Answer: First American denies the allegations set forth in the first sentence of paragraph 28. First American denies all the allegations set forth in the second sentence of paragraph 28 to the extent they are inconsistent with year 2000 US census data. Because the complaint fails to define which of the various HMDA and non-HMDA real estate-related loans offered by the Bank it includes in the so-called "real estate-related" loan data, First American is without knowledge or information to form a belief as to alleged dollar amount and percentages of such loans and therefore denies them.

29. The business policies and practices of First American described in ¶¶12-24 above have achieved the Bank's objective of serving white communities and not minority communities, as further demonstrated by the Bank's overall residential, consumer, and small business lending over time.

Answer: First American denies the allegations set forth in paragraph 29.

30. In 1999, the Bank originated a total of 7,054 loans in the following categories – residential real estate-related, home equity, motor vehicle, other secured consumer, other unsecured consumer, small business, and other small business. Of that loan total, only 274, or 3.9%, were made in majority minority census tracts. In 2000, the Bank originated a total of 7,069 loans in those seven categories, of which only 308, or 4.4%, were made in majority minority census tracts. Of the combined total of 14,123 such loans the Bank originated in 1999 and 2000, only 4.1% were made in majority minority census tracts in a region where 34% of the census tracts were majority minority in 1990.

Answer: Because the complaint fails to define which of the many loans offered by the Bank are included in its calculations, First American is without knowledge or information to form a belief as to alleged number of such loans and percentages alleged in paragraph 30 and therefore denies the allegations. First American denies all the allegations set forth in paragraph 30 to the extent they are inconsistent with year 2000 US census data.

31.     For 1999-2000, the Bank originated 1,226 motor vehicle loans of which 97.6% (1196) were made in majority white census tracts and only 2.4% (30) in majority minority tracts. The strikingly low percentage of such loans in minority census tracts, despite the widespread ownership of automobiles by consumers in neighborhoods of varying racial or ethnic characteristics, evidences the Bank's intentional exclusion of minority communities from its lending operations. See Map attached as Exhibit 9.

Answer: With respect to the allegations set forth in the first sentence of paragraph 31,

because the complaint fails to define the loans it includes in its calculations of "motor vehicle

loans," First American is without knowledge or information to form a belief as to alleged number

and percentages such loans, and denies the allegations to the extent they are inconsistent with

year 2000 US census data. First American is without knowledge or information to form a belief

as to how "widespread" automobile ownership is, and denies the allegations set forth in the

second sentence of paragraph 31 to the extent they are inconsistent with year 2000 US census

data. To the extent an answer may be required to the last sentence of paragraph 31, First

American is without knowledge or information to form a belief as to those allegations and

therefore denies them.

32.     Further demonstrating First American's redlining practices is the demographic distribution of its largest volume credit product – home equity loans. In 1999-2000, the Bank originated 6,365 home equity loans, of which 96.2% (6,123) were in majority white tracts and only 3.8% (242) were in minority tracts despite the fact that 33% of the Chicago region's housing stock is located in minority census tracts. See Map attached as Exhibit 10.

Answer: First American admits home equity loans represents its largest volume credit

product but denies the remaining allegations set forth in the first sentence of paragraph 32. With

respect to the allegations set forth in the second sentence of paragraph 32, because the complaint

fails to define which of the various home equity loans offered by the Bank are included in its

calculations, First American is without knowledge or information to form a belief as to the

alleged number and percentages of such loans, and denies the allegations set forth in paragraph

32. To the extent an answer may be required to the last sentence of paragraph 32, First American

is without knowledge or information to form a belief as to those allegations and therefore denies

them.

33.     The Bank's CRA small business loan originations for 1999-2000 show the same
discriminatory pattern and practice. Of the 1,330 CRA small business loans the Bank originated
in the Chicago/Kankakee MSAs, 1,268 (95.3%) were made in majority white census tracts, and
only 62 (4.7%) in minority tracts in a region which has among the highest number of minority-
owned businesses in the nation, over 95,000. See Map attached as Exhibit 11.

Answer: First American denies the allegations set forth in the first sentence of paragraph

33. With respect to the allegations set forth in the second sentence of paragraph 33, First

American admits the number of loans originated but denies the allegations set forth in paragraph

33. To the extent an answer may be required to the last sentence of paragraph 33, First American

is without knowledge or information to form a belief as to those allegations and therefore denies

them.

34.     The totality of First American's policies and practices described herein constitute
the redlining of majority minority neighborhoods of the Chicago and Kankakee MSAs as off-
limits for the defendant's lending business. The Bank's policies and practices are intended to
deny and discourage, and have the effect of denying or discouraging, an equal opportunity to
residents of minority neighborhoods, on account of the racial and/or national origin composition
of those neighborhoods, to obtain residential real estate-related credit, consumer credit, and
business credit. These policies and practices are not justified by business necessity or legitimate
business considerations.

Answer: Paragraph 34 states legal conclusions to which no answer is required. To the

extent an answer may be required, First American denies the allegations set forth in paragraph

34.

35.     The defendant's actions as alleged herein constitute:
a. Discrimination on the basis of race, color, and national origin in making available

residential real estate-related trans- actions, in violation of the Fair Housing Act, 42 U.S.C. §3605(a);

b. The making unavailable or denial of dwellings to persons, because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. §3604(a);

c. Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. §3604(b); and

d. Discrimination against applicants with respect to credit transactions, on the basis of race, color, and national origin, in violation of the Equal Credit Opportunity Act, 15 U.S.C. §1691(a)(1).

Answer: Paragraph 35 states legal conclusions to which no answer is required. To the extent an answer may be required, First American denies the allegations set forth in paragraph 35 and all of its sub-parts.

36.    The defendant's policies and practices as alleged herein constitute:

a. A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act, 42 U.S.C. §§3601 et seq., and the Equal Credit Opportunity Act, 15 U.S.C. §1691e(h); and

b. A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general public importance.

Answer: Paragraph 36 states legal conclusions to which no answer is required. To the extent an answer may be required, First American denies the allegations set forth in paragraph 36 and all of its sub-parts.

37.    Persons who have been victims of the defendant's discriminatory policies and practices are aggrieved persons as defined in 42 U.S.C. §3602(i) and as described in the Equal Credit Opportunity Act, 15 U.S.C. §1691(e)(i), and have suffered damages as a result of the defendant's conduct in violation of both the Fair Housing and the Equal Credit Opportunity Acts, as described herein.

Answer: Paragraph 37 states legal conclusions to which no answer is required. To the extent an answer may be required, First American denies the allegations set forth in paragraph 37 and all of its sub-parts.

38.    The discriminatory policies and practices of the defendant were, and are,

intentional and willful, and have been implemented with reckless disregard for the rights of residents of minority neighborhoods.

Answer: Paragraph 38 states legal conclusions to which no answer is required. To the extent an answer may be required, First American denies the allegations set forth in paragraph 38 and all of its sub-parts.

First American denies that Plaintiff is entitled to any relief whatsoever in connection with the allegations set forth in the Complaint. To the extent that Plaintiff's prayer for relief states legal conclusions, no answer is required.

\*   \*   \*

To the extent any allegation set forth in the Complaint is not specifically answered above, it is hereby denied. Moreover, the Complaint contains various captions which are either merely descriptive or argumentative. Because the captions do not allege facts, no response is required. To the extent such headings and subheadings contain factual allegations regarding First American's conduct and a response is permitted, each and every heading and subheading is denied.

## II. AFFIRMATIVE DEFENSES

First American alleges the following as separate and distinct affirmative defenses to the Complaint's allegations.

### FIRST AFFIRMATIVE DEFENSE
(Failure to State a Cause of Action)

The Complaint fails to state a cause of action against First American.

## SECOND AFFIRMATIVE DEFENSE
(Disparate Impact Claims are Not Cognizable)

The Complaint's implicit disparate impact claims are not cognizable as a matter of law.

## THIRD AFFIRMATIVE DEFENSE
(Similar Treatment)

Without conceding that First American carries any burdens of proof with respect to Plaintiff's claims, First American asserts that minority neighborhoods and minority applicants were not treated less favorably than similarly situated non-minority neighborhoods and applicants.

## FOURTH AFFIRMATIVE DEFENSE
(Legitimate Business Justification)

First American's lending practices have a legitimate business justification and are the least restrictive means available to achieve those business objectives.

## FIFTH AFFIRMATIVE DEFENSE
(No Injury)

First American denies all allegations of injuries and damages asserted by Plaintiff and demands strict proof thereof.

WHEREFORE, First American respectfully requests that the Complaint be dismissed with prejudice and that this Court enter judgment in First American's favor and that such judgment provide for costs, attorney's fees, and for such other relief as the Court deems just and proper.

Dated: July 16, 2004

Respectfully submitted,

_Jonathan S. Feld_
One of the Attorneys for Defendant

Jonathan S. Feld  (ARDC #6270992)
Katten Muchin Zavis Rosenman
Suite 1600
525 West Monroe Street
Chicago, IL 60661-3693
Tel: (312) 902-5200
Fax: (312) 902-1061


Of Counsel:

Andrew L. Sandler
Benjamin B. Klubes
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 16th day of July, 2004, a true and correct copy of First American Bank's Answer to Plaintiff's Complaint was served by first-class mail, postage prepaid on:

Donna M. Murphy, Esq.
Valerie R. O'Brian, Esq.
Burtis M. Dougherty, Esq.
Housing and Civil Enforcement Section - NWB
Civil Rights Division
U.S. Department of Justice
1800 G Street, NW
7th Floor, Room 7042
Washington, D.C. 20006

Joan Laser, Esq.
Assistant U.S. Attorney
US Attorney's Office for the Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

_____
Jonathan S. Feld